IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD LEDER, ET AL. : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 06-CV-1805 |
| JEROME SHINFELD and : | |
| SAMUEL DEANGELIS : | |

**SURRICK, J.**                                                                                       **MAY 22, 2008**

### MEMORANDUM & ORDER

Presently before the Court are Defendant Samuel DeAngelis's Motion to Dismiss Plaintiffs' Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), (Doc. No. 17), and Defendant Jerome Shinfeld, CPA's Rule 12(b)(6) Motion to Dismiss All Claims, (Doc. No. 14). For the following reasons, Defendants' Motions will be granted and Plaintiffs' Complaint will be dismissed.

### I.    BACKGROUND

This case arises out of a series of alleged misrepresentations concerning the Stock Purchase Agreement (the "SPA") entered into by Plaintiffs Ronald Leder and James Boyle and Defendant DeAngelis and his business partner, Joseph Ehrenreich[1] (collectively, "the Sellers"), for the purchase of 75% of the combined stock of the Seller's companies, Independence Motor Cars, Inc., and Metro Motorcars, Inc. (the "Companies").[2]  Plaintiff's Complaint alleges that in the spring of 2004, Plaintiffs entered into three separate agreements which were tied to the

---

[1] Ehrenreich is not named as a party in this action.

[2] The named Plaintiffs in this case are as follows: Ronald Leder, James Boyle, Boyleder, LP, Independence Motors, Inc., and Metro Motorcars, Inc.

purchase of the Companies' stock.  First, Plaintiffs agreed to purchase the real estate on which the Companies' operations were conducted at 6725 and 6729-33 Essington Avenue, Philadelphia.  (Doc. No. 1 ¶ 13.)  Second, Plaintiffs purchased the Companies' stock.  (*Id.* ¶ 14.)  Third, Plaintiffs entered into two different loan agreements with Manufacturers and Traders Trust Company ("M&T Bank") on May 27, 2004.  (*Id.* ¶¶ 26, 28.)   The first was for a fixed term loan used to finance Plaintiffs' purchase of the Companies and the second was for a revolving credit line used to finance the Companies' existing inventory.  (*Id.*)

### A.     The Real Estate Transaction

Prior to entering into the above agreements, Plaintiffs Leder and Boyle formed two business organizations to effectuate the different transactions.  On March 11, 2004, Boyle and Leder formed Boyleder LLC.  (*Id.* ¶ 12.)  On May 13, 2004, Leder and Boyle formed Boyleder LP, naming Boyleder LLC as the managing partner.  (*Id.* ¶ 13.)  Boyleder LP then purchased the real estate for $7.7 million dollars.  (*Id.* ¶¶ 13-14.)  Plaintiffs financed the purchase through two mortgages obtained from M&T Bank in the amounts of $2,212,500.00 and $3,562,500.00, respectively.  (*Id.* ¶¶ 25-26.)

### B.     The SPA

On May 27, 2004, the Plaintiffs signed the SPA with Sellers for the purchase of 75% of the combined shares of the Companies in exchange for $3,404,504.00.  (*Id*. ¶¶ 14, 25-26.)  Plaintiffs agreed to pay Sellers two million dollars in cash, $1.5 million of which was secured by a loan with M&T Bank.  (*Id.* ¶¶ 25-26.)  The remaining balance was paid for with a promissory note given by Plaintiffs to Sellers.  (*Id.* ¶ 25.)  Under Section 1.2(b) of the SPA, the purchase price was to reflect the Closing Date Book Value of the Companies as determined by the Parties.

(*Id.* ¶ 17.)  Section 1.2(b) provides:

> To determine the Closing Date Book Value, prior to the Closing, the Seller's accountant and Buyers on a basis consistent with each Company's factory statements attached hereto as Schedule 1.2(b), shall make a determination as to the Closing Date Book Value.

(*Id.,* Ex. A at 2.)  However, the Closing Date Book Value was not intended to be the final purchase price.  (*Id.*)  The parties agreed that the purchase price would be subject to adjustment after the signing of the SPA based on the Final Book Value of each Company as of May 31, 2004.  (*Id.*)  This value was to be determined by Seller's accountant, Defendant Jerome Shinfeld.  (*Id.*)  Section 1.2(c) of the Agreement states:

> Within thirty (30) days after Closing, Seller shall have prepared, by its regular accountants, a determination of the final book value of each Company as of the May 31, 2004 (the "Final Book Value").  The Final Book Value shall be prepared in conformity with generally accepted accounting principles applied on a basis consistent with the Companies' regularly prepared factory statements.  If buyers dispute Seller's accountant's determination of the Final Book Value, Buyer's and Seller's accountant shall attempt to agree, within thirty (30) days, upon the determination of Final Book Value, however; if the Buyers and Seller's accountant are unable to agree within such thirty (30) day period, thereafter either party may demand the dispute be resolved by Arbitration in accordance with the rules of the American Arbitration Association.

(*Id.*)  Moreover, Section 2.1 of the SPA also set forth a detailed series of conditions outlining the Parties duties to close the stock purchase.  (*Id.* at 2.)   Section 2.1 states:

> <u>Closing</u>.  The closing ("Closing") with respect to the acquisition of the Purchased Stock under this Agreement and all other transactions contemplated hereby shall take place at 10:00 am local time at the office of Robert L. Arangio, Esquire within five (5) days after satisfaction of the conditions precedent.  However, if Closing fails to occur within _____ (__) days from the date of this Agreement, then either party may terminate this Agreement upon ten (10) days prior written notice to the other.  The date of the Closing is hereinafter called the "Closing Date."
>
> > In the event that Closing shall fail to occur because of the inability to secure manufacturers' approval in accordance with Paragraph 7.7 to this Agreement

3

and Closing shall have occurred on the real estate as set forth on Schedule 2.1 hereto (the "Real Estate"), then in that event, Seller and Buyer shall:

(a) treat buyer hereunder as beneficial owners for all purposes of those shares of Purchased Stock for which legal title cannot be passed to Buyer as a result of the failure to receive manufacturer's approval of the transfer; and

(b) exert their best efforts to seek to resolve the lack of manufacturers approval, whether by restructuring their ownership of the Purchased Stock, or by sale of some or all of the assets of the Companies, or through some other means. Any such resolution of the failure to receive manufacturer's approval shall provide that:

(1) the Buyer shall be relieved of all their obligations to M&T Bank and Seller incurred in connection with the transactions contemplated hereunder; and (ii) Buyer shall be indemnified by Seller against all tax liabilities incurred in such a solution; and (iii) the amount paid by the Buyer pursuant to Paragraph 2.2(a) hereof shall be returned to Buyer (collectively items (1), (ii) and (iii) are the "minimum terms") or shall be subject to Buyer's approval. If no such resolution is achieved within one (1) year of the date hereof, Seller shall enter into an agreement with Buyer that satisfies the Minimum Terms, at Seller's expense.

(d) [sic] Until such time as Buyer is released from any and all debt obligations of Buyer to M&T Bank and Seller, Buyer shall be entitled to seventy-five percent (75%) of the profits of Companies as determined by Companies' regularly employed accountant.

(*Id.* at 2-3.) Despite Sellers' failure to both obtain the Manufacturers' approvals prior to Closing and tender the Companies' stock certificates to Plaintiffs, the Plaintiffs went through with the transaction sometime in 2004. (Doc. No. 1 ¶¶ 30-31.)

    C.    **The Loan Agreements with M&T Bank**

On May 27, 2004, Plaintiffs signed two loan agreements with M&T Bank in connection with their purchase of the Companies. The first was a $14.6 million loan agreement with M&T Bank used to finance the Companies' automobile inventory (hereinafter "the Dealer Floor Plan")

4

(*Id.* ¶¶ 28-29.)³  The amount of the Dealer Floor Plan was based on the Companies' stated inventory as of May 31, 2004, which, in turn, was based on records prepared by Defendant Shinfeld.  (*Id.* ¶¶ 34-35.)  The Dealer Floor Plan required that the Companies maintain a certain minimum level of inventory to remain in compliance with terms of the loan.  (*Id.* ¶ 29.)  Failure to do so would result in default.  (*Id.* ¶ 41.)  In addition, Plaintiffs took out a $1.5 million term loan with M&T Bank to finance their purchase of the Companies.  (*Id.* ¶ 26.)  Defendant DeAngelis and Ehrenreich served as guarantors of this loan in addition to all of the Plaintiffs.

### D.     The Aftermath

By October of 2004, the Companies were so financially extended that they were required to borrow additional capital from M&T Bank to continue operations.  (*Id.* ¶ 32.)⁴  By the end of 2004, the Companies had suffered a $2 million loss.  (*Id.* ¶ 33.)  In 2005, M&T Bank conducted an audit of Plaintiffs' inventory to ensure that they were in compliance with the terms of the Dealer Floor Plan.  (*Id.* ¶ 34.)  The M&T Bank audit revealed that, as of May 31, 2004, Metro Chrysler and Metro Nissan had overstated their existing inventory by $800,000, placing the Companies "out of trust" on the Dealer Floor Plain and in default.  (*Id.* ¶¶ 34, 41.)

In May of 2005, Plaintiffs hired Larson Allen, an independent certified public accounting firm, to audit the Companies' books and records.  (*Id.* ¶ 38.)  On May 20, 2005, Larson Allen issued Plaintiffs an opinion letter outlining their findings.  (*Id.*, Ex. C.)  Larson Allen concluded,

---

³ The Dealer Floor Plans were guaranteed by Metro Chrysler, Metro Nissan and Boyleder and Leder and Boyle, individually.  However, the Sellers remained as guarantors on the Dealer Floor Plans.  Sellers were required to enter into a Forbearance Agreement once the Dealer Floor Plan was found to be "out of trust." (*See* Doc. No. 1, Ex. D.)

⁴ It is unclear, based on a reading of the Plaintiffs' Complaint, and the documents attached thereto, what events lead to the Companies' dire financial condition in October 2004.

*inter alia*, that Defendants misstated the Companies' net worth by $2.13 million by overstating the Companies' earnings by $276,504.00 and failing to account for downward adjustments and writeoffs totaling at least $1,857,000.[5] (*Id.*) Based on Larson Allen's letter, Plaintiffs concluded

---

[5] The Larson Allen letter of May 20, 2005 in its entirety states the following:

Dear Ron & Jim:

You asked us to review the books and records of Independence, Inc., DBA Metro Chrysler, Jeep Suzuki, (Chrysler) and Metro Motor Cars, Inc. (Nissan). You two gentlemen acquired 75% of the stock in both of these corporations on approximately May 31, 2004 from Sam DeAngelis for an amount equal to the combined book value of the assets of those companies. The Agreement of sale provided that the seller's accountant would review the book value within 30 days after closing to determine just what the book value should be and the purchase price would be adjusted accordingly. The review of the book value never happened.

According to the hand written reconciliation of the purchase price that you showed me, as prepared by Sam, the total book value used for the transaction was $3,404,504. You paid 75% of that amount, or $2,553,378, for 75% of the stock. You gave Sam $2,000,000 in cash and agreed to pay him the balance of raising $500,000 in investment funds and borrowing $1,500,000 from M & T Bank, which Sam DeAngelis guaranteed. Over the last year, you became concerned that the book value that you thought existed simply was not there. You have also become concerned that the cash flow which you had expected to achieve from the businesses is not present.

As you know, we had four people, including myself, spend three days at your location reviewing the books and records of bot h companies with particular emphasis on the May 31, 2004 balance sheet accounts. We believe that the book value of the corporations, as of May 31, 2004, was significantly overstated on the hand written schedule as well as on the dealer prepared monthly financial statements.

First of all, the stated total net worth on the internally prepared statements was only $3,128,000, not $3,404,000. I have no idea how the higher number was arrived at, but it does not agree with the books and records as of May 31.

Secondly, we identified a minimum of $1,857,000 in adjustments that should be made to reduce the book value from the $3,128,000 stated book value. We did share some of these adjustments with you when we met with you. They include $665,000 in adjustments to net worth from 2003 that had never been adjusted for. They

that they had overpaid for the Companies' stock by at least $2 million. (Doc. No. 1 ¶ 47.) On May 31, 2005, Plaintiffs notified Defendants that they wished to rescind the deal as provided for in the SPA. (*Id*., Ex. F.)

On July 1, 2005, M&T required the Companies to enter into Forbearance Agreements as

---

> include a $257,000 receivable from CADES management that will never be collected. They also include many other balance sheet accounts that are still on the balance sheet that should be written off.
>
> I have included two schedules of adjustments which will provide you with an idea of the magnitude of what we are referring to. We did not try to quantify each item exactly. I believe that our regular accountant, Jerry Shinfeld, would be better equipped to arrive at exact amounts since he knows your records better than us.
>
> Another area that needs to be addressed concerns the company being accused of being "out of trust" with respect to its floor plan loan with M & T Bank. You told us that M & T Bank recently conducted a floor plan audit of the dealerships to determine if all of the vehicles against which a lien exists were still present on your location. Apparently, they determined that you were out of trust by some $1,800,000.
>
> I believe the problem goes back to the first day you acquired the businesses and borrowed the floor plan loan from M & T Bank. According to your own general ledgers, the book value of new inventory on May 31, 2004 was $2,700,000 <u>less</u> than the total floor plan loans. Even after adjusting that amount for "two pays" customer receivables, it still appears that they probably advanced you approximately $1,800,000 more than the new car inventory you had at that time. Therefore, you have been playing catch up ever since.
>
> In summary, I believe that the combined book values of the corporations only approximated $1,350,000 on May 31, 2004 and not #32,404,000. Therefore, you should have only paid approximately $1,012,500 for 75% of the stock instead of $2,553,000.
>
> Obviously, we are available to discuss our findings with you in greater detail.
>
> Very truly yours
>
> Philip E. Hughes, Jr.

a result of their audit, requiring Plaintiffs to put the Companies up for sale. (Doc. No. 1 ¶ 41.) In connection with these Forbearance Agreements, Plaintiffs entered into a Asset and Real Estate Purchase Agreement with Randy Chapman in the fall of 2005 for the sale of both the Companies and the real estate. (*Id.* ¶ 43.)

On April 28, 2006, Plaintiff filed an eleven-count Complaint, (Doc. No. 1), alleging the following claims:

> Count One: Leder, Boyle and Boyleder against Shinfeld and DeAngelis for Violation of Rule 10b-5 of the Securities and Exchange Act of 1934;
>
> Count Two: Leder, Boyle and Boyleder against Shinfeld and DeAngelis for Violation of the Pennsylvania Securities Act of 1972;
>
> Count Three: Leder, Boyle and Boyleder against Shinfeld for Common Law Fraud;
>
> Count Four: Metro Chrysler and Metro Nissan against Shinfeld for Breach of Contract;
>
> Count Five: Metro Chrysler and Metro Nissan versus Shinfeld for Professional Negligence;
>
> Count Six: Leder, Boyle and Boyleder versus Shinfeld for Breach of Fiduciary Duty;
>
> Count Seven: Leder and Boyle versus Shinfeld and DeAngelis for Defamation;
>
> Count Eight: Boyle versus Shinfeld and DeAngelis for Fraudulent Inducement;
>
> Count Nine: Leder and Boyle versus DeAngelis for Breach of Contract;
>
> Count Ten: Leder, Boyle and Boyleder versus DeAngelis for Breach of Warranty; and
>
> Count Eleven: Leder and Boyle versus DeAngelis for Quantum Meruit.

## II.   LEGAL STANDARD

When considering a motion to dismiss a complaint for failure to state a claim under Rule 12(b)(6), this Court must "accept as true the facts alleged in the complaint and all reasonable

inferences that can be drawn from them. Dismissal under Rule 12(b)(6) . . . is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved." *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir. 1990) (citing *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir. 1988)); *see H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989). For this reason, district courts strongly disfavor Rule 12(b)(6) motions. *Melo-Sonics Corp. v. Cropp,* 342 F.2d 856, 859 (3d Cir. 1965); *Kuromiya v. United States,* 37 F. Supp. 2d 717, 722 (E.D. Pa. 1999). A court will only dismiss a complaint if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *H.J. Inc.,* 492 U.S. at 249-50 (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)); *Neitzke v. Williams,* 490 U.S. 319, 326-327 (1989). However, a court need not credit a plaintiff's "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997).

Since Plaintiffs assert claims under Rule 10b-5 of the Securities Exchange Act of 1934, their Complaint must satisfy the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. 78u-4(b)(1)(B).[6] Congress enacted the PSLRA "to remedy the tactic of filing securities complaints to force unwarranted settlements." *In re PMA Capital Corp. Sec. Litig.*, Civ. No. 03-6121, 2005 WL 1806503, at *5 (E.D.Pa. July 27, 2005). Plaintiffs must "specify each statement alleged to have been misleading, the reasons or the reasons why the statement is misleading, and, if an allegation regarding the statement or

---

[6] Plaintiffs' Complaint contains only one federal claim. All other claims are state law claims. Complete diversity does not exist between the parties. Therefore, our jurisdiction in this case is predicated upon the presence of a federal question brought under Section 10(a) and Rule 10b-5 of the Securities and Exchange Act of 1934.

9

omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *In re Advanta Sec. Litig.*, 180 F.3d 525, 530 (3d Cir. 1999) (citing 15 U.S.C.A. 78u-4(b)(1) (West Supp. 1999)).

## III.     LEGAL ANALYSIS

To state a valid 10b-5 claim, the Plaintiff must demonstrate that Defendants "(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury." *In re Ikon Office Solutions, Inc.* 277 F.3d 658, 666 (3d Cir. 2002) (citing *GFL Advantage Fund, Ltd., v. Colkitt,* 272 F.3d 189, 212 (3d Cir. 2001); *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir. 1997)).[7] The Third Circuit has defined "scienter" as "a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Alpharma*, 372 F.3d at 148 (citing

---

[7] Rule 10b-5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. 240.10b-5.

*In re Ikon Office Solutions, Inc.*, 277 F.3d at 667); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). To properly plead scienter, Plaintiff can either (1) allege facts showing that Defendants had a motive and opportunity to commit fraud, or (2) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *In re Alpharma*, 372 F.3d at 148 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)). Allegations of a Rule 10b-5 violation must raise a "strong inference" of scienter, and must be supported by the "who, what, when, where and how" of the alleged wrong. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004);[8] *see also In re Advanta*, 180 F.3d at 530 (requiring plaintiff to plead scienter with particularity).

In 2007, the United States Supreme Court discussed the pleading standard for scienter in the case of *Tellabs Inc. v. Makor Issues and Rights, LSO*, 127 S. Ct. 2499, 2509 (2007). The court observed that in making the determination of whether scienter has been properly plead "courts must consider the complaint in its entirety, as well as other sources that courts ordinarily examine when ruling on 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference and matters of which a court may take judicial notice." *Id.* The inquiry is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* When determining whether Plaintiff's allegations give rise to a "strong" inference of scienter, "the court must take into account plausible opposing inferences." *Id.* Recognizing that "the

---

[8] *Arazie v. Mullane*, 2 F.3d 1456, 1458 (7th Cir. 1993) (quoting in part *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("'Because only a fraction of financial deteriorations reflect [] fraud,' . . . plaintiffs in securities cases must provide enough information about the underlying facts to distinguish their claims from those of disgruntled investors.")

strength of an inference cannot be decided in a vacuum," the Court added:

> the inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . Yet the inference of scienter must be more than merely "reasonable" or permissible" – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* at 2510.

Judged against this standard, we conclude that Plaintiffs' Complaint fails to raise a "strong inference" of scienter. Although the Plaintiff's Complaint details the Companies' rapid financial deterioration after the signing of the SPA, it fails to allege facts regarding the Parties' pre-signing negotiations, the due diligence process, or facts demonstrating that the Defendants actually knew that the financial statements were fraudulent or acted recklessly in preparing the financial statements. Rather, Plaintiffs allege that Defendants knew that financial statements were fraudulent based upon the results of the Larson Allen audit conducted approximately one year after the SPA was signed. Without more, however, the findings in the Larson Allen letter demonstrate nothing more than a potential disagreement over the book value of the Companies. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004) (quoting *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999) ("A complaint alleging accounting irregularities fails to raise a strong inference of scienter if it 'allege[s] no facts to show that Defendants knew or should have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did.'"). The Larson Allen audit does

not assert that Defendants were guilty of fraudulent or reckless bookkeeping. In fact, the letter suggests that perhaps Defendant *Shinfeld* could be helpful in resolving the value discrepancy based upon his knowledge of the Companies' books. In addition, the fact that the Parties contractually agreed in Section 1.2(c) of the SPA that any dispute between buyers' and sellers' accountants over the Companies' book value would be resolved in arbitration certainly does not support a strong inference of scienter. It is also worth noting here that the SPA specifically provided that each party would have its own attorney and accountant and that each party had had the opportunity to consult legal counsel and had received separate advice concerning the Agreement. (*See* Doc. No. 1, Ex. A, Sections 12.5 and 12.11.)[9]

Finally, Plaintiffs' claim of scienter is even more problematic when we consider the fact that the Defendants agreed to serve as guarantors on the loan agreements with M&T Bank and retained a 25% ownership position in the Companies after the SPA was signed. To find scienter under these circumstances is to assume that the Defendants intentionally defrauded the Plaintiffs to their own ultimate detriment. Certainly Defendants' continued interest in the Companies and

---

[9] Section 12.5 provides:
Expenses. Except as otherwise provided herein, Buyer and Seller shall pay the fees and expenses of their respective accountants and legal counsel incurred in connection with the transactions contemplated by this Agreement. The foregoing notwithstanding, the Company shall be permitted to pay legal and accounting expenses relating to performance of its obligations hereunder.

Section 12.11 provides:
Mutually Acceptable Agreement. The parties hereto consider this to be a mutually agreeable contract and that in the interpretation of this Agreement, no consideration shall be given as to who was responsible for the writing of this Agreement. Each party has had an opportunity to consult legal counsel of their choice to review any aspect of this Agreement and have sought separate advice on the terms and conditions of this Agreement.

the fact that they were guarantors of the loan agreements negates any suggestion that Defendants had a motive to commit fraud in this case. As the Third Circuit noted, fraud without motive "makes little economic sense." *In re Digital Island Sec. Litig.*, 357 F.3d 322, 331 (3d Cir. 2004).

Considering the allegations in Plaintiff's Complaint, the documents attached to the Complaint, and the reasonable inference to be drawn therefrom, we are compelled to conclude that the inference of fraudulent intent proffered by Plaintiff is significantly less plausible and less compelling than the competing inference of non-fraudulent intent. Accordingly, we conclude that Plaintiff has failed to allege facts that give rise to a strong inference of scienter.

Assuming, *arguendo*, that Plaintiffs adequately pled scienter, Plaintiffs have nevertheless failed to demonstrate that their reliance upon Defendants' financial statements was reasonable. To establish a claim under Rule 10b-5, Plaintiffs must show that they reasonably relied on the alleged misrepresentations or omissions that form the basis of their claims. *Tracinda Corp. v. DaimlerChrysler AG,* 364 F.Supp.2d. 362, 401 (D. Del. 2005) (internal citations omitted). "The 'reasonable reliance' element of a Rule 10b-5 claim requires a showing of a causal nexus between the misrepresentation and the Plaintiff's injury, as well as a demonstration that the Plaintiff exercised the due diligence that a reasonable person under all the circumstances would have exercised to protect his own interests." *AES Corp. v. The Dow Chemical Co.,* 325 F.3d 174, 178 (3d Cir. 2003) (noting that determination of reasonable reliance must "be made on a case-by-case basis based on all of the surrounding circumstances").

In *Straub v. Vaisman & Co.,* 540 F.2d 591 (3d Cir. 1976), the Third Circuit set forth a list of factors that the Court should consider in determining whether a plaintiff's reliance was

reasonable. *Id.* at 598. Those factors include the plaintiff's opportunity to detect the fraud, the sophistication of the plaintiff, the existence of a longstanding business or personal relationship, and the plaintiff's access to the relevant information. *Id.* Considering these factors in this case, we are compelled to conclude that Plaintiffs' reliance, if any, on Defendants' alleged misrepresentations concerning the value of the Companies was not reasonable.

There is nothing in Plaintiffs' Complaint, or the documents attached to the Complaint, indicating that Defendants attempted to prevent Plaintiffs from conducting their own independent investigation. In fact, the SPA specifically anticipated that Plaintiffs' accountant would review the books and records of the Companies to determine the Final Book Value. *See Tracinda*, 364 F.Supp.2d at 401 (finding plaintiffs' reliance unreasonable where plaintiff shareholder was a sophisticated investor who was kept apprised of merger negotiations through detailed materials and had track record of requiring written documentation before entering into transactions). We note that the Larson Allen audit indicates that Plaintiffs evidently relied on a "hand-written reconciliation of the purchase price" prepared by Defendant DeAngelis, instead of conducting their own due diligence. (*See* Doc. No. 1, Ex. C.) While we recognize that "a sophisticated investor is not barred by reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced," *Straub*, 540 F.2d at 598, the Plaintiffs' failure to conduct extensive due diligence in a transaction of this magnitude was not only unreasonable, it bordered on reckless. Obviously an audit of the books of the Companies in 2004 would have revealed the same information that the Larson Allen audit revealed in 2005.

Perhaps more importantly, Plaintiffs here were sophisticated businessmen with years of experience working in the Companies. The Parties' business relationship was memorialized in

Section 4.4 of the SPA, which states:

> Each buyer acknowledges that they are long-standing employees of the Companies and that during the period of their employment with Companies; they are intimately familiar with the business and operations of the Companies and have been responsible for the management of the Companies. During their period of employment, they have become familiar, not only with the operations of Companies, but with the risks attendant with the operations of Companies' business and they understand the risks of, and other considerations relating to, the purchase of stock of the Companies.

(Doc. No. 1, Ex. A, § 4.4.) Finally, as long-time employees of the Companies, Plaintiffs were well-positioned to fully understand and investigate the Companies' internal operations and its financial well-being. The Parties' business relationship extended back to at least May 1992, when Plaintiff Boyle made the first of a series of payments to Defendants in an attempt to acquire a minority interest in one of the Companies. Based upon Plaintiffs' knowledge of the business, considering the provisions of the SPA itself, and considering the evident lack of due diligence, we are compelled to conclude that any reliance by Plaintiffs on Defendants' alleged misrepresentation or omissions was not reasonable.

For these reasons we conclude that Defendants' motions to dismiss the Rule 10b-5 claim in Count One of Plaintiffs' Complaint must be granted. The status of the state law claims in Plaintiffs' Complaint will be addressed at conference`.[10]

---

[10] Under 28 U.S.C. § 1367, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Were we to permit Plaintiff to proceed in this Court with their state law tort and contract claims, we would do so pursuant to the doctrine of supplemental jurisdiction. The Supreme Court has noted that supplemental jurisdiction is a "doctrine of discretion, not of plaintiff's right," *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966), and that the exercise of supplemental jurisdiction "must depend on questions of judicial economy, convenience, and fairness to litigants." *City of Pittsburgh Comm'n on Human Relations v. Key Bank USA*, 163 Fed. Appx

---

163, 166 (3d Cir. 2006) (citing *Gibbs*, 383 U.S. at 726). However, the cases are clear that when all of the federal claims are dismissed at an early stage, the district court should decline the exercise of supplemental jurisdiction over the state claims absent extraordinary circumstances. *City of Pittsburgh Comm'n on Human Relations*, 163 Fed. Appx at 166 (citing *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) ("'[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'") (citation omitted)); *Shaffer v. Bd. of Sch. Dirs. of Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984) ("We have held that pendent jurisdiction should be declined where the federal claims are no longer viable, absent 'extraordinary circumstances.'") (citation omitted)).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD LEDER, ET AL. : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 06-CV-1805 |
| JEROME SHINFELD and : | |
| SAMUEL DEANGELIS : | |

**ORDER**

AND NOW, this <u>22nd</u> day of May, 2008, upon consideration of Defendant Samuel DeAngelis's Motion to Dismiss Plaintiffs' Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), (Document No. 17), and Defendant Jerome Shinfeld, CPA's Rule 12(b)(6) Motion to Dismiss All Claims, (Document No. 14), it is ORDERED that Count One of Plaintiff's Complaint is DISMISSED.

IT IS SO ORDERED.

BY THE COURT:

_____
R. Barclay Surrick, Judge