IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RONALD LEDER, ET AL.        :
       :        CIVIL ACTION
      v.        :
       :        NO. 06-1805
JEROME SHINFELD, ET AL.        :

**SURRICK, J.**        **APRIL 14 , 2009**

<u>**MEMORANDUM**</u>

Presently before the Court are Defendant Samuel DeAngelis's Motion to Dismiss Plaintiffs' Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6) (Doc. No. 17), and Defendant Jerome Shinfeld, CPA's Rule 12(b)(6) Motion to Dismiss All Claims (Doc. No. 14). For the following reasons, Defendants' Motions will be granted in part and denied in part.

## I.    BACKGROUND

Plaintiffs brought this action on April 28, 2006, alleging violation of Section 10b-5 of the Securities Exchange Act of 1934, and ten state law tort and contract claims. (Doc. No. 1 (hereinafter, "Compl.").) Defendants filed motions to dismiss (Doc. Nos. 14, 17), and Plaintiffs responded thereto (Doc. No. 20). On May 22, 2008, we filed a Memorandum and Order dismissing the Rule 10b-5 claim. *See generally Leder v. Shinfeld*, No. 06-1805, 2008 U.S. Dist. LEXIS 40925 (E.D. Pa. May 22, 2008). While the Order of May 22, 2008 disposed of the sole federal claim, we retained jurisdiction over the case pursuant to 28 U.S.C. § 1367(c) for purposes

of considering the remainder of Defendants' motions to dismiss.[1]  In the interest of clarity, we

will restate the relevant background from the May 22, 2008 Memorandum.

This case arises out of a series of alleged misrepresentations concerning a Stock Purchase

Agreement (the "SPA") entered into by Plaintiffs Ronald Leder and James Boyle and Defendant

DeAngelis and his business partner, Joseph Ehrenreich (collectively "Seller"),[2] for the purchase

of 75% of the combined stock of Seller's companies, Independence Motor Cars, Inc., and Metro

Motorcars, Inc. (the "Companies").[3]  The Complaint alleges that in the Spring of 2004, Plaintiffs

made several arrangements to facilitate the purchase of the Companies' stock, including

purchasing the real estate where the Companies' operations were conducted (Compl. ¶ 13) and

entering into financing agreements with Manufacturers and Traders Trust Company ("M&T

Bank"), (id. ¶¶ 26, 28).  Plaintiffs made three sets of arrangements in anticipation of purchasing

the Companies.

### A.      The First Arrangement:  Plaintiffs' Real Estate Purchase

---

[1] "Pendent jurisdiction is not a plaintiff's right, but a matter of district court discretion,
and may be declined for a range of valid reasons that are codified in Section 1367(c)."  *City of
Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 171 (1997).  Section 1367(c) counsels against
the exercise of jurisdiction when "the claim raises a novel or complex issue of state law," and
when "the [state] claim substantially predominates over the [federal] claims . . . ."  28 U.S.C.
§ 1367(a).  The court should, however, exercise supplemental jurisdiction in a way that "best
serves the principles of economy, convenience, fairness and comity."  *Int'l Coll. of Surgeons*,
522 U.S. at 173 (*quoting Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  In this
case, Defendants have fully briefed their motions to dismiss, and Plaintiffs have responded.
Addressing these motions will promote economy, convenience, and fairness.

[2] Ehrenreich is not named as a party in this action.  The SPA refers to DeAngelis and
Ehrenreich collectively as "Seller."  We adopt this formulation for purposes of this
Memorandum.

[3] The named Plaintiffs in this case are:  Ronald Leder; James Boyle; Boyleder, LP;
Independence Motors, Inc.; and Metro Motorcars, Inc.

In anticipation of purchasing the real estate where the Companies' conducted their operations, Plaintiffs Leder and Boyle formed two business organizations to effectuate the transactions. On March 11, 2004, Boyle and Leder formed Boyleder LLC. (*Id.* ¶ 12.) On May 13, 2004, Leder and Boyle formed Boyleder LP, naming Boyleder LLC as the managing partner. (*Id.* ¶ 13.) Boyleder LP then purchased the real estate for $7.7 million dollars. (*Id.* ¶¶ 13-14.) Plaintiffs financed the purchase through two mortgages obtained from M&T Bank in the amounts of $2,212,500.00 and $3,562,500.00. (*Id.* ¶ 14 n.4.)

**B.     The Second Arrangement: Plaintiff's Stock Purchase**

On May 27, 2004, Plaintiffs Leder and Boyle signed the SPA with Seller for the purchase of 75% of the combined shares of the Companies in exchange for $3,404,504.00. (*Id.* ¶¶ 14, 25-26.) Plaintiffs agreed to pay Seller $2 million in cash, $1.5 million of which was secured by a loan with M&T Bank. (*Id.* ¶¶ 25-26.) The remaining balance was paid for with a promissory note given by Plaintiffs to Seller. (*Id.* ¶ 25.) Under section 1.2(b) of the SPA, the purchase price was to reflect the Closing Date Book Value of the Companies as determined by the Parties. (*Id.* ¶ 17.) Section 1.2(b) provides:

> To determine the Closing Date Book Value, prior to the Closing, the Seller's accountant and Buyers on a basis consistent with each Company's factory statements attached hereto as Schedule 1.2(b), shall make a determination as to the Closing Date Book Value.

(*Id.*, Ex. A § 1.2(b).) However, the Closing Date Book Value was not intended to be the final purchase price. (*Id.*) The parties agreed that the purchase price would be subject to adjustment after the signing of the SPA based on the Final Book Value of each Company as of May 31, 2004. (*Id.*) This value was to be determined by Seller's accountant, Defendant Jerome Shinfeld. (*Id.*) Section 1.2(c) of the SPA states:

3

Within thirty (30) days after Closing, Seller shall have prepared, by its regular accountants, a determination of the final book value of each Company as of the May 31, 2004 (the "Final Book Value").  The Final Book Value shall be prepared in conformity with generally accepted accounting principles applied on a basis consistent with the Companies' regularly prepared factory statements.  If buyers dispute Seller's accountant's determination of the Final Book Value, Buyer's and Seller's accountant shall attempt to agree, within thirty (30) days, upon the determination of Final Book Value, however; if the Buyers and Seller's accountant are unable to agree within such thirty (30) day period, thereafter either party may demand the dispute be resolved by Arbitration in accordance with the rules of the American Arbitration Association.

(*Id.* § 1.2(c).)  Moreover, section 2.1 of the SPA also set forth a detailed series of conditions outlining the Parties' duties to close the stock purchase.  (*Id.* § 2.1.)   Section 2.1 states:

> Closing.  The closing ("Closing") with respect to the acquisition of the Purchased Stock under this Agreement and all other transactions contemplated hereby shall take place at 10:00 am local time at the office of Robert L. Arangio, Esquire within five (5) days after satisfaction of the conditions precedent.  However, if Closing fails to occur within _____ (__) days from the date of this Agreement, then either party may terminate this Agreement upon ten (10) days prior written notice to the other.  The date of the Closing is hereinafter called the "Closing Date."

> In the event that Closing shall fail to occur because of the inability to secure manufacturers' approval in accordance with Paragraph 7.7 to this Agreement and Closing shall have occurred on the real estate as set forth on Schedule 2.1 hereto (the "Real Estate"), then in that event, Seller and Buyer shall:

>> (a) treat buyer hereunder as beneficial owners for all purposes of those shares of Purchased Stock for which legal title cannot be passed to Buyer as a result of the failure to receive manufacturer's approval of the transfer; and

>> (b) exert their best efforts to seek to resolve the lack of manufacturers [sic] approval, whether by restructuring their ownership of the Purchased Stock, or by sale of some or all of the assets of the Companies, or through some other means.  Any such resolution of the failure to receive manufacturer's approval shall provide that:

>>> (i) the Buyer shall be relieved of all their obligations to M&T Bank and Seller incurred in connection with the transactions contemplated hereunder; and (ii) Buyer shall be indemnified

4

by Seller against all tax liabilities incurred in such a solution; and (iii) the amount paid by the Buyer pursuant to Paragraph 2.2(a) hereof shall be returned to Buyer (collectively items (i), (ii) and (iii) are the "minimum terms") or shall be subject to Buyer's approval.  If no such resolution is achieved within one (1) year of the date hereof, Seller shall enter into an agreement with Buyer that satisfies the Minimum Terms, at Seller's expense.

(d) [sic] Until such time as Buyer is released from any and all debt obligations of Buyer to M&T Bank and Seller, Buyer shall be entitled to seventy-five percent (75%) of the profits of Companies as determined by Companies' regularly employed accountant.

(*Id.* § 2.1.)  Despite Seller's failure both to obtain the Manufacturers' approvals prior to Closing and to tender the Companies' stock certificates to Plaintiffs, Plaintiffs consummated the transaction sometime in 2004.  (Compl. ¶¶ 30-31.)

## C.    The Third Arrangement:  Loan Agreements with M&T Bank

On May 27, 2004, Plaintiffs signed two loan agreements with M&T Bank in connection with their purchase of the Companies.  Plaintiffs Metro Chrysller and Metro Nissan entered into the first agreement, a $14.6 million loan used to finance the Companies' automobile inventory (hereinafter, "the Dealer Floor Plan").  (*Id.* ¶¶ 28-29.)[4]  The amount of the Dealer Floor Plan was based on the Companies' stated inventory as of May 31, 2004, which, in turn, was based on records prepared by Defendant Shinfeld.  (*Id.* ¶¶ 34-35.)  The Dealer Floor Plan required that the Companies maintain a certain minimum level of inventory to remain in compliance with terms of the loan.  (*Id.* ¶ 29.)  Failure to do so would result in default.  (*Id.* ¶ 41.)  In addition, Plaintiffs

---

[4] The Dealer Floor Plan was guaranteed by Metro Chrysler, Metro Nissan, and Boyleder as well as Leder and Boyle, individually.  However, Seller remained as a guarantor on the Dealer Floor Plan.  Seller was required to enter into a Forbearance Agreement once the Dealer Floor Plan was found to be "out of trust."  (*See* Compl., Ex. D.)

Leder and Boyle took out a $1.5 million term loan to finance their purchase of the Companies's stock.  (*Id.* ¶ 26.)  Defendant DeAngelis and Mr. Ehrenreich served as guarantors of this loan in addition to all Plaintiffs.

### D.   The Aftermath

By October 2004, the Companies were so financially extended that they had to borrow additional capital from M&T Bank in order to continue operations.  (*Id.* ¶ 32.)[5]  By the end of 2004, the Companies had suffered a $2 million loss.  (*Id.* ¶ 33.)  In 2005, M&T Bank audited Plaintiffs' inventory to ensure that it complied with the terms of the Dealer Floor Plan.  (*Id.* ¶ 34.)  The audit revealed that Metro Chrysler and Metro Nissan had overstated their existing inventory by $800,000, as of May 31, 2004, placing the Companies "out of trust" on the Dealer Floor Plan and in default.  (*Id.* ¶¶ 34, 41.)

In May 2005, Plaintiffs hired Larson Allen, an independent certified public accounting firm, to audit the Companies' books and records.  (*Id.* ¶ 38.)  On May 20, 2005, Larson Allen issued an opinion letter to Plaintiffs outlining its findings.  (*Id.*, Ex. C.)  Larson Allen concluded, *inter alia*, that Defendants misstated the Companies' net worth by $2.13 million by overstating the Companies' earnings by $276,504.00 and by failing to account for downward adjustments and writeoffs totaling at least $1,857,000.[6]  (*Id.*)  Based on Larson Allen's letter,

---

[5] Based on a reading of the Complaint and the documents attached thereto, it is unclear what brought about the Companies' dire financial condition in October 2004.

[6] In its entirety, the Larson Allen letter of May 20, 2005 states:

Dear Ron & Jim:

You asked us to review the books and records of Independence, Inc., DBA Metro Chrysler, Jeep Suzuki, (Chrysler) and Metro Motor Cars, Inc. (Nissan).  You two

6

gentlemen acquired 75% of the stock in both of these corporations on approximately May 31, 2004 from Sam DeAngelis for an amount equal to the combined book value of the assets of those companies.  The Agreement of sale provided that the seller's accountant would review the book value within 30 days after closing to determine just what the book value should be and the purchase price would be adjusted accordingly.  The review of the book value never happened.

According to the hand written reconciliation of the purchase price that you showed me, as prepared by Sam, the total book value used for the transaction was $3,404,504.  You paid 75% of that amount, or $2,553,378, for 75% of the stock. You gave Sam $2,000,000 in cash and agreed to pay him the balance of raising $500,000 in investment funds and borrowing $1,500,000 from M&T Bank, which Sam DeAngelis guaranteed.  Over the last year, you became concerned that the book value that you thought existed simply was not there.  You have also become concerned that the cash flow which you had expected to achieve from the businesses is not present.

As you know, we had four people, including myself, spend three days at your location reviewing the books and records of both companies with particular emphasis on the May 31, 2004 balance sheet accounts.  We believe that the book value of the corporations, as of May 31, 2004, was significantly overstated on the hand written schedule as well as on the dealer prepared monthly financial statements.

First of all, the stated total net worth on the internally prepared statements was only $3,128,000, not $3,404,000.  I have no idea how the higher number was arrived at, but it does not agree with the books and records as of May 31.

Secondly, we identified a minimum of $1,857,000 in adjustments that should be made to reduce the book value from the $3,128,000 stated book value.  We did share some of these adjustments with you when we met with you.  They include $665,000 in adjustments to net worth from 2003 that had never been adjusted for.  They include a $257,000 receivable from CADES management that will never be collected.  They also include many other balance sheet accounts that are still on the balance sheet that should be written off.

I have included two schedules of adjustments which will provide you with an idea of the magnitude of what we are referring to.  We did not try to quantify each item exactly.  I believe that our regular accountant, Jerry Shinfeld, would be better equipped to arrive at exact amounts since he knows your records better than us.

Another area that needs to be addressed concerns the company being accused of being "out of trust" with respect to its floor plan loan with M&T Bank.  You told us

Plaintiffs concluded that they had overpaid for the Companies' stock by at least $2 million. (Compl. ¶ 47.)  On May 31, 2005, Plaintiffs notified Defendants that they wished to rescind the deal as provided for in the SPA.  (*Id*., Ex. F.)

On July 1, 2005, M&T Bank required the Companies to enter into Forbearance Agreements as a result of its audit, requiring Plaintiffs to put the Companies up for sale. (Compl. ¶ 41.)  In connection with these Forbearance Agreements, Plaintiffs entered into a Asset and Real Estate Purchase Agreement with a third party in the Fall of 2005 for the sale of both the Companies and the real estate.  (*Id*. ¶ 43.)

On April 28, 2006, Plaintiff filed an eleven-count Complaint asserting claims arising out of their arrangements to purchase the Companies.  (*See* Compl.)  On May 22, 2008, we

---

that M&T Bank recently conducted a floor plan audit of the dealerships to determine if all of the vehicles against which a lien exists were still present on your location. Apparently, they determined that you were out of trust by some $1,800,000.

I believe the problem goes back to the first day you acquired the businesses and borrowed the floor plan loan from M&T Bank.  According to your own general ledgers, the book value of new inventory on May 31, 2004 was $2,700,000 <u>less</u> than the total floor plan loans.  Even after adjusting that amount for "two pays" customer receivables, it still appears that they probably advanced you approximately $1,800,000 more than the new car inventory you had at that time.  Therefore, you have been playing catch up ever since.

In summary, I believe that the combined book values of the corporations only approximated $1,350,000 on May 31, 2004 and not $32,404,000.  Therefore, you should have only paid approximately $1,012,500 for 75% of the stock instead of $2,553,000.

Obviously, we are available to discuss our findings with you in greater detail.

Very truly yours

Philip E. Hughes, Jr.

dismissed Count I, alleging violation of Rule 10b-5, for failure to state a claim. *Leder*, 2008 U.S.

Dist. LEXIS 40925, at *20-29.   Ten counts remain:

> Count Two:   Leder, Boyle, and Boyleder against Shinfeld and DeAngelis for
> Violation of the Pennsylvania Securities Act of 1972;
>
> Count Three:  Leder, Boyle, and Boyleder against Shinfeld for Common Law
> Fraud;
>
> Count Four:   Metro Chrysler and Metro Nissan against Shinfeld for Breach of Contract;
>
> Count Five:   Metro Chrysler and Metro Nissan against Shinfeld for Professional
> Negligence;
>
> Count Six:    Leder, Boyle, and Boyleder against Shinfeld for Breach of Fiduciary
> Duty;
>
> Count Seven:  Leder and Boyle against Shinfeld and DeAngelis for Defamation;
>
> Count Eight:  Boyle against Shinfeld and DeAngelis for Fraudulent Inducement;
>
> Count Nine:   Leder and Boyle against DeAngelis for Breach of Contract;
>
> Count Ten:    Leder, Boyle, and Boyleder against DeAngelis for Breach of Warranty;
> and
>
> Count Eleven: Leder and Boyle against DeAngelis for Quantum Meruit.

We consider each Count in turn.[7]

## II.   LEGAL STANDARD

When considering a motion to dismiss a complaint for failure to state a claim under Rule

12(b)(6), this Court must "accept as true the facts alleged in the complaint and all reasonable

inferences that can be drawn from them.  Dismissal under Rule 12(b)(6) . . . is limited to those

---

[7] Defendants argue that this matter should be stayed and the parties instructed to bring their disputes to arbitration.  (*See* Doc. Nos. 22, 23.)  The arbitration clause in the SPA applies only to disputes regarding the determination of the Final Book Value.  (Compl., Ex. A § 1.2(c).) As will be discussed in, *infra*, no Final Book Value was ever determined in this matter.

instances where it is certain that no relief could be granted under any set of facts that could be proved." *Markowitz v. Ne. Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990) (*citing Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir. 1988)); *see H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989).  For this reason, district courts strongly disfavor Rule 12(b)(6) motions.  *Melo-Sonics Corp. v. Cropp,* 342 F.2d 856, 859 (3d Cir. 1965); *Kuromiya v. United States*, 37 F. Supp. 2d 717, 722 (E.D. Pa. 1999).  A Rule 12(b)(6) motion to dismiss must be denied if a plaintiff's factual allegations are "enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true, (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  However, a court need not credit a plaintiff's "bald assertions" or "legal conclusions" when deciding a motion to dismiss.  *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

Federal Rule of Civil Procedure 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  This heightened pleading standard requires "plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).  Stated differently, "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of . . . fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198,

217 (3d Cir. 2002) (citation and internal quotations omitted).

## III.   LEGAL ANALYSIS

### A.   Pennsylvania Securities Act of 1972 (Count Two)

Count Two of the Complaint alleges violations of the Pennsylvania Securities Act of 1972 ("PSA"), 70 Pa. Cons. Stat. Ann. §§ 1-101, *et seq.*[8]   Section 1-401 of the PSA was enacted to address substantially the same wrongful conduct as Rule 10b-5, which was promulgated under Section 10b, 15 U.S.C. § 78j(b), of the Securities Exchange Act of 1934.   "The Commissioner's Note to section 101 of the Uniform Securities Act, from which section [1-]401 of the Pennsylvania Securities Act is taken, reads:  'This section is substantially the Securities and Exchange Commission's Rule (10b-5).'"  *Goodman v. Moyer*, 523 F. Supp. 35, 38 n.8 (E.D. Pa. 1981).   Notwithstanding this history, we find ourselves in the same position as Judge Newcomer in 1981, who, when addressing an action under section 1-401, noted that "[n]one of the parties

---

[8] Section 1-501 of the PSA establishes civil liability for violations of the PSA and creates several causes of action.  *See* 70 Pa. Cons. Stat. Ann. § 1-501; *see also Fox Int'l Relations v. Fiserv Sec., Inc.*, 490 F. Supp. 2d 590, 602 (E.D. Pa. 2007) (discussing some theories of liability available under section 1-501).  Count Two of the Complaint cites to section 1-501 of the PSA, without stating what subsection of section 1-501 or underlying violation identified by section 1-501 serves as a basis for their claim.  Based on the language of the Complaint, however, Plaintiffs appear to allege a section 1-401 securities fraud violation, which section 1-501 explicitly contemplates.  (*See* Compl. ¶¶ 55-61 (basing PSA theory of liability on untrue statements of material fact knowingly made by Defendants).)  In their motions to dismiss, Defendants construe Plaintiffs' theory as a section 1-401 theory.  (Doc. No. 14 at 32; Doc. No. 17 at 32.)  Plaintiffs' opposition does the same, noting that the section on which Plaintiffs rely "reads identical to the language contained in Rule 10b-5."  (Doc. No. 20 at 25.)  Plaintiffs incorporate their legal arguments regarding their Rule 10b-5 claim into their argument regarding their PSA claim, and they do not make any arguments about additional or alternative theories of liability under section 1-501 or the PSA.  (*See id.*)  Accordingly, we analyze Count II as a section 1-401 claim, which is "functionally identical" to a Rule 10b-5 claim.  *See, e.g.*, *Rosen v. Commc'n Serv. Group, Inc.*, 155 F. Supp. 2d 310, 321 n.14 (E.D. Pa. 2001) ("Section 401 of the Pennsylvania Securities Act is modeled after Rule 10b-5 of the federal securities laws, and requires virtually the same elements of proof.").

has been able to supply the Court with determinative case law as to what is required under section [1-]401, and the Court has not found a Pennsylvania case on all fours with this one." *Goodman*, 523 F. Supp. at 38.[9]

The absence of guiding precedent from Pennsylvania courts notwithstanding, it has long been the practice in this Circuit to treat section 1-401 claims as requiring the same elements of proof as required under Rule 10b-5.  *See, e.g.*, *GFL Advantage Fund, Ltd., v. Colkitt*, 272 F.3d 189, 214 (3d Cir. 2001) (holding that section 1-401 "is modeled after Rule 10b-5 of the federal securities laws, and requires virtually the same elements of proof" (*citing Rosen*, 155 F. Supp. 2d at 321 n.14)); *Majer v. Sonex Research, Inc.*, 541 F. Supp. 2d 693, 712-13 (E.D. Pa. 2008) (same); *Fox Int'l Relations*, 490 F. Supp. 2d at 602 (same); *Joyce v. Bobcat Oil & Gas, Inc.*, No. 07-1421, 2008 WL 919724, at *13-14 (M.D. Pa. Apr. 3, 2008) (same); *Gilliland v. Hergert*, No. 05-1059, 2007 WL 4104223, at *1-2 (W.D. Pa. Nov. 15, 2007) (same); *Susquehanna Capital Group v. Rite Aid Corp.*, No. 01-1462, 2002 WL 31528490, at *3 (E.D. Pa. Sept. 17, 2002) (same).  Moreover, because a claim under section 1-401 is based on allegations of fraud, Rule 9(b)'s requirement of particular pleading applies to Count Two.  *See Berk v. Ascott Inv. Corp.*, 759 F. Supp. 245, 262 (E.D. Pa. 1991); *Rosenbaum & Co. v. H.J. Myers Co.*, No. 97-824, 1997 WL 689288, at *3 (E.D. Pa. Oct. 9, 1997).  The parties do not dispute this interpretation. (*See* Doc. No. 14 at 32-34; Doc. No. 20-5 at 25.)

---

[9] The only detailed discussion we have found in the Pennsylvania courts regarding the required elements of proof for an action brought under sections 1-401 and 1-501 of the Pennsylvania Securities Act appears in *Engle v. Cassell*, 44 Pa. D. & C.3d 301, 312-15 (Pa. Ct. Com. Pl. 1986), *vacated*, 526 A.2d 818 (Pa. Super. Ct. 1987) (per curiam).  The decision in *Engle* was vacated without comment by a per curiam order of Pennsylvania Superior Court.  *See* 526 A.2d 818.

12

In *Goodman*, the court rejected the plaintiff's argument that section 1-401 of the PSA was substantially identical to section 17 of the Securities Act of 1933, rather than section 10b of the Exchange Act and Rule 10b-5 promulgated thereunder, noting that "[t]he major flaw in this argument is that section 17 addresses only fraud on the part of the purchaser, while Rule 10b-5 controls purchases and sales." *Goodman*, 523 F. Supp. at 38.   The Court then observed that it was

> not convinced that the Pennsylvania courts would not require proof of intent to defraud. In light of the similarity of the language used, and the similar policy carried out through Rule 10b-5 and sections 1-401 and 1-501 of the Pennsylvania Securities Act, the Court must conclude that Pennsylvania courts would require similar elements of proof in actions brought under those sections of the Pennsylvania Securities Act.

*Id*. at 39.   We agree.   The Order of May 22, 2008, dismissed Plaintiff's Rule 10b-5 claim for failure to plead with particularity as required by Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1)(B).   *See Leder*, 2008 U.S. Dist. LEXIS 40925, at *20-22.   Specifically, we found that Plaintiffs failed to allege the scienter and reasonable reliance elements of the claim with the requisite specificity.   (*Id*. at 10-16.)

While Plaintiffs' PSA claim may not be subject to the heightened pleading standard of the PSLRA,[10] it still must comply with Rule 9(b)'s heightened pleading requirements.   As

---

[10] Courts in this district have often analyzed Rule 10b-5 and section 1-401 claims together, giving the appearance that the same standard applies to both on a motion to dismiss. *See Sunquest Info. Sys. v. Dean Witter Reynolds, Inc.*, 40 F. Supp. 2d 644, 659-61 (E.D. Pa. 1999) (analyzing Rule 10b-5 and PSA claim together under seemingly same standard on a motion to dismiss); *TFM Inv. Group v. Bauer*, No. 99-840, 1999 U.S. Dist. LEXIS 15821, at *8 (E.D. Pa. Sept. 29, 1999) (relying on reasons for dismissing Rule 10b-5 claim for failure to satisfy Rule 9(b) and the PSLRA as a basis for dismissing section 1-401 claim); *see also Majer*, 541 F. Supp. 2d at 712 (same).   However, the courts addressing the issue directly have determined that the heightened pleading requirements of the PSLRA do not apply to the PSA. *See Joyce*, 2008 WL 919724, at *14 ("[U]nder Rule 9(b), we can dismiss the state-law securities

discussed in the May 22, 2008 Memorandum, the Complaint does not adequately plead

reasonable reliance.  We explained the defect in the Complaint's allegations of reasonable

reliance as follows:

> To establish a claim under Rule 10b-5, Plaintiffs must show that they reasonably relied on the alleged misrepresentations or omissions that form the basis of their claims.  *Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d. 362, 401 (D. Del. 2005) (internal citations omitted).  "The 'reasonable reliance' element of a Rule 10b-5 claim requires a showing of a causal nexus between the misrepresentation and the Plaintiff's injury, as well as a demonstration that the Plaintiff exercised the due diligence that a reasonable person under all the circumstances would have exercised to protect his own interests."  *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178 (3d Cir. 2003) (noting that determination of reasonable reliance must "be made on a case-by-case basis based on all of the surrounding circumstances").

> In *Straub v. Vaisman & Co.*, 540 F.2d 591 (3d Cir. 1976), the Third Circuit set forth a list of factors that the Court should consider in determining whether a plaintiff's reliance was reasonable.  *Id.* at 598.  Those factors include the plaintiff's opportunity to detect the fraud, the sophistication of the plaintiff, the existence of a longstanding business or personal relationship, and the plaintiff's access to the relevant information.  *Id.*  Considering these factors in this case, we are compelled to conclude that Plaintiffs' reliance, if any, on Defendants' alleged misrepresentations concerning the value of the Companies was not reasonable.

> There is nothing in Plaintiffs' Complaint, or the documents attached to the Complaint, indicating that Defendants attempted to prevent Plaintiffs from conducting their own independent investigation.  In fact, the SPA specifically anticipated that Plaintiffs' accountant would review the books and records of the Companies to determine the Final Book Value.  *See Tracinda*, 364 F. Supp. 2d at 401 (finding plaintiffs' reliance

---

claims and fraud claims for the same reasons we found Plaintiff's 10b-5 claim deficient, a lack of specificity in the allegations discussed above.  However, this conclusion does not include the failure to properly plead the scienter element.  The scienter element was found wanting because of the PSLRA's heightened pleading requirement for causes of action under the Securities and Exchange Act of 1934, a requirement that does not apply to state-law claims."); *Majer v. Sonex Research, Inc.*, No. 05-606, 2006 WL 2038604, at *12 n.15 (E.D. Pa. July 19, 2006) ("Although the state law fraud claims are not subject to the heightened pleading requirements of the [PSLRA], they must be 'stated with particularity' under the heightened pleading standard of Fed. R. Civ. P. 9(b)."); *see also* 15 U.S.C. § 78u-4(b)(2) (providing for heightened pleading as to state of mind "[i]n any private action arising under this chapter").

unreasonable where plaintiff shareholder was a sophisticated investor who was kept apprised of merger negotiations through detailed materials and had track record of requiring written documentation before entering into transactions).  We note that the Larson Allen audit indicates that Plaintiffs evidently relied on a "hand-written reconciliation of the purchase price" prepared by Defendant DeAngelis, instead of conducting their own due diligence.  (*See* [Compl.], Ex. C.)  While we recognize that "a sophisticated investor is not barred by reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced," *Straub*, 540 F.2d at 598, the Plaintiffs' failure to conduct extensive due diligence in a transaction of this magnitude was not only unreasonable, it bordered on reckless.  Obviously an audit of the books of the Companies in 2004 would have revealed the same information that the Larson Allen audit revealed in 2005.

Perhaps more importantly, Plaintiffs here were sophisticated businessmen with years of experience working in the Companies. The Parties' business relationship was memorialized in Section 4.4 of the SPA, which states:

> Each buyer acknowledges that they are long-standing employees of the Companies and that during the period of their employment with Companies; they are intimately familiar with the business and operations of the Companies and have been responsible for the management of the Companies. During their period of employment, they have become familiar, not only with the operations of Companies, but with the risks attendant with the operations of Companies' business and they understand the risks of, and other considerations relating to, the purchase of stock of the Companies.

([Compl.], Ex. A § 4.4.) Finally, as long-time employees of the Companies, Plaintiffs were well-positioned to fully understand and investigate the Companies' internal operations and their financial well-being. The Parties' business relationship extended back to at least May 1992, when Plaintiff Boyle made the first of a series of payments to Defendants in an attempt to acquire a minority interest in one of the Companies. Based upon Plaintiffs' knowledge of the business, considering the provisions of the SPA itself, and considering the evident lack of due diligence, we are compelled to conclude that any reliance by Plaintiffs on Defendants' alleged misrepresentation or omissions was not reasonable.

*Leder*, 2008 U.S. Dist. LEXIS 40925, at *24-27.  This analysis applies with equal force to

Plaintiffs' section 1-401 claim.  Therefore, Plaintiffs' have failed to plead the reliance element of

their section 1-401 with the requisite specificity and Count Two must be dismissed.

**B.      Fraud (Count Three)**

15

Count Three of the Complaint alleges common law fraud.  To sustain this claim, Plaintiffs must allege facts that satisfy the following elements:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994); *see also Overall v. Univ. of Pa.*, 412 F.3d 492, 498 (3d Cir. 2005) (same); *Jefferies v. Ameriquest Mortgage Co.*, 543 F. Supp. 2d 368, 386 (E.D. Pa. 2008) (same).  As with statutory claims under Rule 10b-5 and the Pennsylvania Securities Act, allegations of common law fraud are subject to Rule 9(b)'s requirement of pleading with particularity.

Count Three fails for the same reasons as the statutory fraud claims in Counts One and Two.  Plaintiffs' Complaint states that Defendant Shinfeld "fraudulently and intentionally prepared said financial documents containing material and gross overstatements of the asset account balances knowing that said documents were to be utilized and relied upon by Plaintiffs in determining the combined book value of the assets of the Companies."  (Compl. ¶ 67.)  The Complaint also states that Plaintiffs "justifiably relied upon the financial documents containing material and gross overstatements of the asset account balances prepared by Shinfeld as stating the correct combined book value of the assets of the Companies."  (*Id.* ¶ 68.)  Notably, Plaintiffs themselves defend the viability of their common law fraud claim by incorporating their argument in support of their Rule 10b-5 and Pennsylvania Securities Act claims.[11]  (Doc. No. 20-5 at 26-

---

[11] As with their section 1-401 claim, Plaintiffs need not plead their common law fraud claims with the particularity required by the PSLRA.  *Cf. In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 n.5 (3d Cir. 1999) ("Rule 9(b)'s provision allowing state of mind to be averred generally conflicts with the [PSLRA's] requirement that plaintiffs 'state with particularity facts

27.)  As discussed above, the Complaint does not allege facts sufficient to establish justifiable reliance under Rule 9(b)'s heightened pleading standard.  Accordingly, Count Three fails as a matter of law and must be dismissed.

### C.    Breach of Contract (Count Four) and Professional Negligence (Count Five)

Count Four alleges breach of contract by Plaintiffs Metro Chrysler and Metro Nissan against Defendant Shinfeld.  To support a claim for breach of contract, a plaintiff must allege: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damage.  *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 580 (Pa. Super. Ct. 2003), *appeal denied*, 852 A.2d 313 (Pa. 2004); *see also Ware v. Rodale Press, Inc*., 322 F.3d 218, 225 (3d Cir. 2003) (same); *Abdulhay v. Bethlehem Med. Arts, L.P.*, 425 F. Supp. 2d 646, 659 (E.D. Pa. 2006).  Unlike Counts One through Three, breach of contract claims are not subject to Rule 9(b)'s heightened pleading requirement.

Plaintiffs Metro Chrysler and Metro Nissan have alleged the existence of a professional services agreement between them and Defendant Shinfeld.  (Compl. ¶ 74.)  They have further alleged that this agreement included an implied covenant of good faith and fair dealing.  (*Id*. ¶ 75.)  Plaintiffs have alleged that Defendant Shinfeld breached this duty by rendering services improperly (*id*. ¶ 77-79) and that this breach caused them to suffer damages (*id*. ¶ 80).

Whether or not these allegations are sufficient to plead a claim of breach of contract depends on whether the professional services agreement between the parties contained an implied covenant of good faith and fair dealing.  This question has been a source of confusion

---

giving rise to a strong inference' of scienter.  In that sense, we believe the [PSLRA] supersedes Rule 9(b) as it relates to Rule 10b-5 actions.") (internal citation omitted).

17

and disagreement among Pennsylvania and federal courts in recent years.  The Pennsylvania

Supreme Court's most recent reference to the question left the matter unresolved.  In *Ash v.*

*Continental Insurance Co.*, 932 A.2d 877 (Pa. 2007), the court stated:

> Our review of the case law indicates considerable disagreement over the applicability
> of the implied duty of good faith. Section 205 of the Restatement of Contracts states:
> "Every contract imposes on each party a duty of good faith and fair dealing in its
> performance and its enforcement."  Restatement (Second) of Contracts § 205.  Some
> courts have opined that Pennsylvania has adopted § 205.  *See, e.g.*, *Herzog v.*
> *Herzog*, 887 A.2d 313, 317 (Pa. Super. Ct. 2005); *Conomos, Inc. v. Sun Co., Inc.*,
> 831 A.2d 696, 705-06 (Pa. Super. Ct. 2003).  In addition, on at least two occasions,
> members of this Court have stated [that] § 205 has been adopted by Pennsylvania
> courts, and therefore, the duty is implied in every contract; however, both of those
> statements were made in non-precedential opinions.  *See Bethlehem Steel Corp. v.*
> *Litton Indus., Inc.*, 488 A.2d 581, 600 (Pa. 1985) (Zappala, J., Opinion in Support of
> Reversal);  *Frickert v. Deiter Bros. Fuel Co.*, 347 A.2d 701, 705 (Pa. 1975)
> (Pomeroy, J., concurring).  On the other hand, a number of courts have indicated
> [that] the covenant of good faith and fair dealing is recognized only in limited
> situations.  *See, e.g.*, *Agrecycle, Inc. v. City of Pittsburgh*, 783 A.2d 863 (Pa.
> Commw. Ct. 2001); *Dep't of Transp. v. E-Z Parks, Inc*., 620 A.2d 712 (Pa. Commw.
> Ct. 1993); *Creeger Brick & Bldg. Supply Inc. v. Mid-State Bank & Trust Co., SEDA*,
> 560 A.2d 151 (Pa. Super. Ct. 1989).
>
> In *Fraser v. Nationwide Mut. Ins. Co.*, 135 F. Supp. 2d 623 (E.D. Pa. 2001), the court
> reconciled the conflicting case law, determining, "[u]nder Pennsylvania Law, a
> covenant of good faith and fair dealing is implied in every contract.  However, it
> does not create a cause of action in every case."  *Id*. at 643 (citations omitted).
> Despite the apparent conflict over the applicability of the implied duty of good faith,
> we decline to engage in a discussion of this issue as it is not presently before us.

*Id*. at 883 n.2.

In the absence of case law from the Pennsylvania courts, we are bound by the Third

Circuit's interpretation of Pennsylvania law.  *Fremont v. E.I. DuPont DeNemours & Co.*, 988 F.

Supp. 870, 874 (E.D. Pa. 1997) (turning to Third Circuit's prediction of Pennsylvania state law

in context of good faith and fair dealing).  In this instance, the Third Circuit has spoken clearly

on the question of when an implied covenant of good faith and fair dealing can give rise to a

cause of action.  In *Parkway Garage, Inc. v. City of Philadelphia*, the Third Circuit concluded

that "under Pennsylvania law, every contract does not imply a duty of good faith."  5 F.3d 685,

700 (3d Cir. 1993) (relying on *Creeger*, 560 A.2d at 153-54), *overruled on other grounds by UA*

*Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003).  The court further

stated that "we predict that the Pennsylvania Supreme Court would not extend the limited duty

of good faith to a situation . . . in which there already exists an adequate remedy at law."  *Id.* at

702.  The court vacated the jury's finding that the defendant had breached an implied duty of

good faith and fair dealing, ruling that the plaintiff was able to recover under 42 U.S.C. § 1983

based upon the identical facts.  *Id.*  Subsequently, in *Northview Motors, Inc., v. Chrysler Motors*

*Corp.*, 227 F.3d 78 (3d Cir. 2000), the Third Circuit reaffirmed its holding in *Parkway Garage*:

> In view of these precedents, we believe that if a plaintiff alleging a violation of the
> implied covenant of good faith also were to file a claim for fraud based on the same
> set of facts, Pennsylvania courts likely would decline to proceed with the claim
> alleging bad faith. Instead, Pennsylvania courts would consider the other claims in
> the plaintiff's complaint. Such an approach limits the use of the bad faith cause of
> action to those instances where it is essential. The covenant of good faith necessarily
> is vague and amorphous. Without such judicial limitations in its application, every
> plaintiff would have an incentive to include bad faith allegations in every contract
> action. If construed too broadly, the doctrine could become an all-embracing
> statement of the parties' obligations under contract law, imposing unintended
> obligations upon parties and destroying the mutual benefits created by legally
> binding agreements.

*Id.* at 92.  District courts in this Circuit have applied these holdings consistently.  *See, e.g.*,

*Fremont*, 988 F. Supp. at 874-75; *see also Chester Perfetto Agency, Inc. v. Chubb & Son*, No.

99-3492, 1999 WL 972010, at *3-5 (E.D. Pa. Oct. 21, 1999); *Rho v. Vanguard OB/GYN Assocs.,*

*P.C.*, No. 98-1673, 1999 WL 228993, at *6-7 (E.D. Pa. Apr. 15, 1999); *Toys "R" US-Penn, Inc.*

*v. Discovery Zone, Inc.*, No. 95-2534, 1996 WL 47980, at *6-7 (E.D. Pa. Feb. 6, 1996).

In this case, Plaintiffs Metro Chrysler and Metro Nissan have alleged professional

negligence against Defendant Shinfeld in Count Five.  (Compl. ¶¶ 81-91.)  This Count is based

upon allegations substantially identical to the allegations supporting the breach of contract claim

in Count Four.  (*Id.*)  To state a claim for professional negligence, a plaintiff must allege

(1) employment of a professional or other basis for a duty; (2) the failure of the professional to

exercise ordinary skill and knowledge; and (3) that such negligence was the proximate cause of

damage to the plaintiff.  *Kituskie v. Corbman*, 714 A.2d 1027, 1029 (Pa. 1998); *see also Rizzo v.

Haines*, 555 A.2d 58, 65 (Pa. 1989) (noting same elements); *see also Nat'l Grange Mut. Ins. Co.

v. Goldstein, Heslop, Steel, Clapper, Oswalt & Stoehr*, 142 Fed. App'x 117, 120 (3d Cir. 2005)

(unpublished opinion) (applying elements set out in *Kituskie*, 714 A.2d at 1029); *I.B.E.W. Local

Union 380 Pension Fund v. Buck Consultants*, No. 03-4932, 2008 WL 269476, at *6 (E.D. Pa.

Jan. 30, 2008) (same).  Plaintiffs Metro Chrysler and Metro Nissan have alleged the existence of

a professional services agreement with Defendant Shinfeld creating a duty of care that required

Defendant Shinfeld to "act in accordance with accounting industry standards."  (Compl. ¶¶ 82-

83.)  They have further alleged that Defendant Shinfeld breached this duty (*id*. ¶¶ 84-90) and that

Plaintiffs suffered damages as a proximate cause of Defendant Shinfeld's breach (*id*. ¶ 90).

These allegations are sufficient to state a claim for professional negligence.

Plaintiffs Metro Chrysler and Metro Nissan may proceed with their professional

negligence claim under Count Five.  However, we conclude that under the rule from *Parkway

Garage*, Plaintiffs' claim for breach of an implied duty of good faith and fair dealing must be

dismissed.

### D.      Breach of Fiduciary Duty (Count Six)

Count Six alleges that Defendant Shinfeld breached a fiduciary duty owed to Plaintiffs

Leder, Boyle, and Boyleder.  "A fiduciary relationship exists where there is 'a relationship involving trust and confidence, and the proof must show confidence reposed by one side and domination and influence exercised by the other.'"  *Thompson v. Glenmede Trust Co.*, No. 92-5233, 1993 WL 349352, at *4 (E.D. Pa. Sept. 8, 1993) (*quoting Antinoph v. Laverell Reynolds Sec., Inc*., 703 F. Supp. 1185, 1188 (E.D. Pa. 1988)).  "It is not enough to show that the plaintiff reposed its trust in the defendant; the latter must also have accepted the fiduciary relationship."  *Id*.; *see also City of Harrisburg v. Bradford Trust Co.*, 621 F. Supp. 463, 473 (M.D. Pa. 1985).  In determining whether a fiduciary relationship exists, "the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side."  *eToll, Inc., v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 23 (Pa. Super. Ct. 2002) (*quoting Basile v. H & R Block*, 777 A.2d 95, 101 (Pa. Super. Ct. 2001)).  "A confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power."  *Id*.

Plaintiffs Leder, Boyle and Boyleder admit that Defendant Shinfeld's formal agreement for the provision of professional services was with Plaintiff Metro Chrysler and Metro Nissan. (Compl. ¶¶ 82, 93.)  In Count Six they attempt to plead the existence of a direct fiduciary relationship by alleging that Defendant Shinfeld was "in an overmastering and dominant position with respect to" Plaintiffs on account of his "superior knowledge of accounting practices and procedures" (*id*. ¶ 94), and by alleging that they "placed a justifiable trust in Shinfeld and the accounting services that he provided to Metro Chrysler and Metro Nissan" (*id*. ¶ 95).  Plaintiffs

fail to allege, however, that Defendant Shinfeld ever manifested assent to a fiduciary or agency

relationship.  On the contrary, Plaintiffs' Complaint alleges that Defendant Shinfeld "served as

the independent certified public accountant for Metro Chrysler and Metro Nissan . . ." (*id*. ¶ 6),

and describes him as the Companies' "long standing and regular accountant" (*id*. ¶ 17).  The

SPA between Plaintiffs Leder and Boyle, and Defendant DeAngelis and Mr. Ehrenreich did

require Defendant DeAngelis to secure a determination of the Final Book Value of the

Companies from Defendant Shinfeld.  However, the duty created by the SPA was between the

parties to that agreement, and Defendant Shinfeld was not a party.  Most tellingly, Plaintiffs

allege that "Leder and Boyle relied upon the financial documents prepared *on behalf of the*

*Companies* by Shinfeld."  (*Id*. ¶ 22 (emphasis added).)  Thus, the Complaint plainly states that

the documents that form the basis of Plaintiffs' breach of fiduciary duty claim were drafted on

behalf of the Companies, not Leder and Boyle.  Even when viewed in the light most favorable to

Plaintiffs, this statement is fatal to Plaintiffs' claim.  In the absence of an allegation that

Defendant Shinfeld assented to a direct fiduciary or agency relationship with Plaintiffs Leder,

Boyle, or Boyleder, Plaintiffs' allegation of a breach of fiduciary duty cannot stand.  Count Six

must therefore be dismissed.

### E.    Defamation (Count Seven)

Count Seven alleges defamation by Plaintiffs Leder and Boyle against Defendants

Shinfeld and DeAngelis.  To state a cause of action for defamation, a plaintiff must allege:

(1) the defamatory character of the communication; (2) its publication by the defendant; (3) its

application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning;

(5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special

22

harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion.  42 Pa. Cons. Stat. Ann. § 8343(a); *see also Lewis v. Phila. Newspapers, Inc.*, 833 A.2d 185, 191 (Pa. Super. Ct. 2003), *appeal denied*, 844 A.2d 553 (Pa. 2004); *Smith v. IMG Worldwide, Inc.*, 437 F. Supp. 2d 297, 307 (E.D. Pa. 2006).  "Whether a statement can reasonably be construed as defamatory is a question of law for the court to decide."  *Rockwell v. Allegheny Health, Educ. & Research Found.*, 19 F. Supp. 2d 401, 404 (E.D. Pa. 1998) (internal citation omitted).  In determining whether a statement is defamatory under Pennsylvania law, a court must examine the effect that the statement is calculated to produce and "the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate." *Id*. at 405 (internal quotation omitted).  A statement is defamatory if it "tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him" or if it "ascribes to another conduct, character or condition that would adversely affect his fitness for the proper conduct of his proper business." *Maier v. Maretti*, 671 A.2d 701, 704 (Pa. Super. Ct. 1996), *appeal denied*, 694 A.2d 622 (Pa. 1997).

Count Seven fails to state a viable claim for defamation.  First, Plaintiffs have alleged that the defamatory statements at issue in this case are a series of financial documents created by Defendant Shinfeld regarding the asset value of the Companies.  (Compl. ¶¶ 22-23, 27, 36-39, 105.)  Count Seven, however, is alleged by Plaintiffs Leder and Boyle, not the Company Plaintiffs.  Plaintiffs have not alleged the existence of any potentially false or defamatory statement about Plaintiffs Boyle and Leder by Defendants.  Count Seven appears to restate Plaintiffs' breach of contract and breach of fiduciary duty claims.  In the absence of any

23

allegation of a defamatory statement about Plaintiffs Boyle and Leder, it does not allege a claim of defamation.  Count Seven must be dismissed.

### F.    Fraudulent Inducement (Count Eight)

In Count Eight, Plaintiff Boyle alleges common law fraudulent inducement against Defendants Shinfeld and Deangelis.  Under Pennsylvania law, a claim for fraudulent inducement entails the same elements as a claim for common law fraud but also requires an allegation that the misrepresentation at issue was made with specific intent to induce another to enter into a contract when the person had no duty to enter into the contract.  *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1187 (Pa. Super. Ct. 2005); *see also Permenter v. Crown Cork & Seal Co., Inc.*, 38 F. Supp. 2d 372, 381-82 (E.D. Pa. 1999), *aff'd*, 210 F.3d 358 (3d Cir. 2000).  Pennsylvania courts have consistently held that the concealment of a material fact by a defendant amounts "to a culpable misrepresentation no less than does an intentional false statement."  *Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991); *see also De Joseph v. Zambelli*, 139 A.2d 644, 647 (Pa. 1958) (holding that "[f]raud arises where the misrepresentation is knowingly false, where there is a concealment calculated to deceive, or where there is a non-privileged failure to disclose").  Claims for fraudulent inducement are also subject to Rule 9(b)'s requirement of pleading with particularity.  *See Harold v. McGann*, 406 F. Supp. 2d 562, 574-75 (E.D. Pa. 2005).

Plaintiff Boyle's fraudulent inducement claim fails for the same reason as Counts One, Two, and Three:  he has failed to adequately plead reasonable or justifiable reliance with the requisite particularity.  Plaintiff Boyle alleges that he was justified in relying upon the financial estimates prepared by Defendant Shinfeld and allegedly conveyed by Defendant DeAngelis

because Defendant Shinfeld was the Companies' regularly employed accountant.  (Compl. ¶ 119.)  But as we have explained at length in dismissing Count One, the allegations and exhibits before us demonstrate that Plaintiff Boyle was plainly unreasonable in relying upon the information provided to him by these accountants, when he had the knowledge and the opportunity to conduct independent due diligence before undertaking the transaction in question.  *Leder*, 2008 U.S. Dist. LEXIS 40925, at *21-24.  Thus, Count Eight must also be dismissed.

### G.    Breach of Contract (Count Nine) and Breach of Warranty (Count Ten)

Counts Nine and Ten allege breach of contract and breach of warranty respectively.  Defendant DeAngelis argues that these theories of breach are based upon duties which either did not exist under the SPA, or which were subject to conditions precedent that were never satisfied.  Because both theories are contract theories, we review them together under the standard discussed in, *supra*.

### 1.    Failure to have Defendant Shinfeld prepare a determination of the Final Book Value of the Companies within thirty days of the execution of the SPA

Plaintiffs allege that under the SPA, "[Defendant] DeAngelis was required to have the Companies' regular accountant prepare a determination of the final book value of each of Metro Chrysler and Metro Nissan within thirty (30) days of execution of the SPA, in accordance with generally accepted accounting principles."  (Compl. ¶ 123.)  Plaintiffs further allege that "DeAngelis has failed and refused, and continues to fail and refuse to cause a determination of the Final Book Value to be made."  (*Id*. ¶ 124.)  Defendant DeAngelis responds that the closing was a condition precedent to the provision of a determination of the Final Book Value of the Companies, and argues that by Plaintiffs' own admission, the closing never took place.  (Doc.

No. 17 at 42.)

A review of the SPA and Plaintiffs' Complaint supports Defendant DeAngelis's argument.  The SPA provides, in relevant part:  "Within thirty (30) days after Closing, Seller shall have prepared, by its regular accountants, a determination of the final book value of each Company as of May 31, 2004 (the 'Final Book Value')."  (Compl., Ex. A § 1.2(c).)  By the plain language of the SPA, therefore, closing was a condition precedent to the duty to procure a Final Book Value determination.  The plain language of the contract similarly describes and defines what would be entailed in the closing.  Per section 2 of the SPA, the Closing consists of the payment of the stock purchase price from Buyer to Seller (*id*. § 2.2) and the transfer of the purchased stock from Seller to Buyer (*id*. § 2.3 ("Such transfer shall be affected by delivery of the stock certificates representing the Purchased Stock, or by the delivery of a fully executed and notarized Assignment Separate from Certificate, if the original stock certificate is unavailable.")).

Defendant DeAngelis correctly argues that Plaintiffs' own Complaint admits, twice, that the closing never took place.  (Compl. ¶ 30 ("Closing on the SPA never took place . . . ."); *id*. ¶ 31 ("Closing was unable to occur . . . .").)  Plaintiffs' implied argument that Defendant DeAngelis' receipt of the initial payment and promissory note constituted a functional closing directly contravenes the clear terms of the SPA and is therefore unavailing.  (Doc. No. 20-5 at 36.)  As closing never took place, Plaintiffs cannot proceed under a theory of breach based upon a failure to procure a determination of the Final Book Value.

2.      *Failure to reduce the principal amount of the Note when the Final Book Value was less than the Closing Date Book Value*.

Plaintiffs next argue that Defendant DeAngelis breached the contract because he failed to

reduce the principal amount of the Note.  Per section 1.2(b) of the SPA:

> To determine the Closing Date Book Value, prior to the Closing, the Seller's accountant and Buyers on a basis consistent with each Company's factory statements attached hereto as Schedule 1.2(b), shall make a determination as to the Closing Date Book Value.

(Compl., Ex. A § 1.2(b).)  Moreover, section 1.2(c) provides, in relevant part:

> In the event Final Book Value is less than Closing Date Book Value, the principal amount of the Note, as set forth in Paragraph 2.2, shall be reduced.  In the event that the Final Book Value is in excess of the Closing Date Book Value, then such amount shall be added to the Principal of the Note as set forth in Paragraph 2.2.

(*Id*. § 1.2(c).)  Therefore, determination of both the Closing Date Book Value and the Final Book Value was a condition precedent to any reduction or addition to the Principal of the Note.

As discussed above, Plaintiffs admit that the closing never occurred, and, accordingly, the Final Book Value could not be determined.  Moreover, Plaintiffs have not alleged that the Closing Date Book Value was ever determined.  Plaintiffs have not alleged the satisfaction of conditions precedent necessary to trigger the duty they claim Defendant DeAngelis breached.  Plaintiffs therefore may not proceed on a breach of contract theory based on a failure to reduce the amount of the Principal in the Note.

> 3. *Failure to secure requisite approval from the auto manufacturers for the transfer of the stock to Plaintiffs Leder and Boyle.*

Plaintiffs allege that Defendant DeAngelis breached the SPA by failing to secure the approval of the automobile manufacturers for the consummation of the stock purchase.  Section 7 of the SPA is titled "CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE," and provides that

> [t]he obligation of Buyer to acquire the Purchased Stock as contemplated hereby, and to perform its other obligations hereunder to be performed on or after the Closing, shall be subject to the fulfillment, on or prior to the Closing Date, unless otherwise

waived in writing by Buyer, of the following conditions . . . .

(*Id.* § 7.)  Section 7.7 of the SPA provides that

> [e]ach manufacturer for which the Companies hold a Dealer Sales and Service Agreement shall have approved the transfer of the stock to Buyer, as provided in this agreement, without any modification of Companies Sales and Service Agreements except for facilities improvements as set forth on Schedule 3.22.

(*Id.* § 7.7.)  The most reasonable reading of section 7.7 is that Defendant DeAngelis and Mr. Ehrenreich, as the "Seller," were expected to procure the consent of the manufacturers. However, the introductory language of section 7 makes clear that breach of this duty by Defendant DeAngelis does not give rise to damages such as would support an actionable claim for breach of contract.  Under the SPA, a breach of section 7 obviates Plaintiffs' obligation to proceed with the closing.  As discussed above, the closing never took place and Plaintiffs were never under any obligation to participate in it.  Thus, it is unclear whether a remedy exists under a theory of breach premised exclusively on section 7.

In any event, such an inquiry is irrelevant because Section 5 provides a basis for a breach of contract claim, including a remedy.  Section 5's general language states that "[w]ithout Buyer's written approval, Seller covenants and agrees as follows throughout the period from the date hereof through and including the Closing Date . . . ."  (*Id.* § 5.)  Section 5.4, titled "Authorization from Others," provides that "Seller shall use their [sic] reasonable efforts to obtain all authorizations, consents and approvals of third parties or governmental agencies that may be required to permit the consummation of the transactions contemplated by this agreement."[12]  (*Id.* § 5.4.)  Like the provision of section 7, the duty imposed by section 5.4 is

---

[12] The language of the contract is ambiguous with regard to whether Seller had exclusive responsibility for obtaining the manufacturers' approvals.  Section 4, titled "BUYERS

subject to a built-in remedial provision elsewhere in the contract.  In this case, section 2.1 of the

SPA specifies the remedy if the parties fail to secure the necessary approvals from the auto

manufacturers:

> In the event, however, that Closing shall fail to occur because of the inability to secure manufacturers' approval in accordance with Paragraph 7.7 to this Agreement and Closing shall have occurred on the real estate as set forth on Schedule 2.1 hereto (the "Real Estate"), then Buyer and Seller shall:
> . . .
> (B) exert their best efforts to seek to resolve the lack of manufacturers approval by restructuring their ownership of the Purchased Stock, or by sale of some or all of the assets of the Companies, or through some other means.  Any such resolution of the failure to receive manufacturers approval shall provide that: (i) the Buyer shall be relieved of all their obligations to M&T Bank and Seller incurred in connection with the transactions contemplated hereunder; and (ii) Buyer shall be indemnified by Seller against all tax liabilities incurred in such a solution; and (iii) the amount paid by Buyer pursuant to Paragraph 2.2(a) hereof shall be returned to Buyer (collectively items (i), (ii), and (iii) are the "Minimum Terms") or shall be subject to Buyer's approval.  If no such resolution is achieved within one (1) year of the date hereof, Seller shall enter into an agreement with Buyer that satisfies the Minimum Terms, at Seller's expense.

(*Id.* § 2.1.)  Plaintiffs allege that Defendant DeAngelis has failed to abide by his obligations

under this provision of the SPA and that they are owed the Minimum Terms as described above.

(Compl. ¶¶ 131-32.)  Plaintiffs Leder and Boyle may proceed with a breach of contract claim on

---

WARRANTIES," states:

> Except as set forth on Schedule 4.3, all requisite consents, authorizations, licenses, permits, orders, certificates, and approvals of all third parties and/or governmental agencies, including without limitation any governmental agency or authority of the United States, or other jurisdiction whose approval is necessary for Buyer to consummate the transactions contemplated by this Agreement have been obtained.

(*Id.*)  Schedule 4.3 has not been attached to any of the parties' filings in this matter and is not
before us.  Therefore, we are unable to discern whether or how section 4.3 implicates Defendant
DeAngelis's apparent duty under sections 7.7 and 5.4.  Notwithstanding this ambiguity in the
SPA's language, the facts alleged, when viewed in the light most favorable to Plaintiffs, are still
sufficient to state an action for breach of contract as discussed above.

this theory.

        4.     *Breach of warranty; failure to indemnify for breach of the SPA*

Finally, Plaintiffs allege breach of contract on the theory that Defendant DeAngelis has

failed to abide by several warranties and duties to indemnify in the SPA.[13]  Section 3 of the SPA,

which is titled "REPRESENTATIONS AND WARRANTIES OF SELLER," states generally

that "Seller represents, warrants and covenants to Buyer as of the date hereof and as of the

Closing Date as follows . . . ."  (*Id.*, Ex. A § 3.)  Section 3.21, titled "Disclosure," provides:

> No representation or warranty in this Agreement and no statement contained
> elsewhere in this Agreement or in any Schedule, Exhibit, Certificate or other
> document furnished or to be furnished to Buyer pursuant hereto or in connection with
> the transactions contemplated under this Agreement contains or will contain any
> untrue statement of a material fact or to Seller's best knowledge, omits or will omit
> to state a material fact or any fact necessary to make the statements contained therein
> not materially misleading.

(*Id.* § 3.21.)  Moreover, section 5.2, titled "Notice of Breach," which is also under section 5's

general language of Seller's covenants, provides:

> To the extent Seller obtains actual knowledge that any of the representations or
> warranties contained in Article 3 hereof would be incorrect in any material respect
> were those representations or warranties made immediately after such knowledge
> was obtained, Seller shall notify Buyer in writing promptly of such fact and exercise
> their reasonable efforts to remedy same to the extent within Seller's control.

(*Id.* § 5.2.)  Finally, section 11.1, titled "Indemnification by Seller" states:

> Seller hereby agrees to defend indemnify and hold Buyer, the Companies and their
> respective officers, directors, shareholders, employees, agents, attorneys and

---

[13] Plaintiffs point to sections 3.23 and 7.1.  Both of these sections, however, are declarations that the warranties and covenants contained in section 3 are true.  They do not directly reference the provision of documents containing untrue statements, as alleged here, nor the obligation of Defendant DeAngelis to provide notice of breach.  They are, for purposes of this matter, redundant clauses that do not give rise to a cause of action for breach in and of themselves.

representatives, harmless from, and against any damages, liabilities, losses and expenses (including, without limitation, reasonable attorney's fees) which may be sustained or suffered by Buyer or Companies arising out of, based upon, or by reason of a breach of any representation or warranty, or failure to perform any agreement or covenant made by Seller in this Agreement or in any exhibit, schedule, certificate or financial statement delivered hereunder; provided, however, that (a) no indemnification shall be payable with respect to any claim for breach of any representation, warranty or covenant asserted by Buyer or Companies after the survival date as is prescribed for such representation, warranty or covenant in the proviso of the first sentence of section 10.1 hereof.

(*Id*. § 11.1.)  Collectively, these provisions impose duties upon Defendant DeAngelis to ensure that information provided in relation to the SPA is materially correct, to provide notice if he becomes aware that any such information is materially incorrect, and to indemnify Plaintiffs Leder and Boyle should they suffer any losses based upon a breach of these covenants.

Plaintiffs have alleged that Defendant DeAngelis provided them with financial information containing materially incorrect information related to the value of the companies. (*See* Compl. ¶¶ 22-23, 27, 36-39.)  They have further alleged that this violation caused them significant financial loss by preventing the consummation of the SPA.  (*Id*. ¶¶ 135, 146.)  Such allegations, if proven true, would be sufficient to establish a claim for breach of the warranty in section 3.23 and the duties imposed by sections 5.2 and 11.1.  Plaintiffs Leder and Boyle may therefore proceed under a breach of warranty theory pursuant to these provisions.

Count Ten also names Plaintiff Boyleder.  Boyleder, however, was not a party to the SPA.  (*See* Compl., Ex. A.)  Plaintiffs have not alleged a separate contractual relationship between Plaintiff Boyleder and Defendant DeAngelis that could give rise to a breach of contract claim.  Nor have Plaintiffs alleged or argued that Plaintiff Boyleder can recover as a third-party beneficiary to the SPA.  Even if they had, such a theory would fail because Pennsylvania law governs the SPA (*id*. § 12.7), and "the Pennsylvania Supreme Court [has] recognized that a party

becomes a third party beneficiary 'only where both parties to the contract express an intention to benefit the third party in the contract itself.'"[14] *Tredennick v. Bone*, No. 07-0735, 2007 U.S. Dist. LEXIS 87941, at *7-8 (W.D. Pa. Nov. 29, 2007) (*quoting Scarpitti*, 609 A.2d at 149-50). The SPA manifests no express intention to benefit Plaintiff Boyleder.  Therefore, Plaintiff Boyleder may not proceed under either Count Nine or Count Ten.

### H.     Quantum Meruit

Finally, Count Eleven alleges quantum meruit by Plaintiffs Leder and Boyle against Defendant DeAngelis.  The Pennsylvania Supreme Court has noted that "it has long been held in th[e] Commonwealth [of Pennsylvania] that the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract, regardless of how 'harsh the provisions of such contracts may seem in the light of subsequent

---

[14] The Pennsylvania Supreme Court has also recognized an exception to this rule by adopting section 302 of the Restatement (Second) of Contracts.  *See Scarpitti v. Weborg*, 609 A.2d 147, 149 (Pa. 1992).  Section 302 provides that:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intentions of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 168 (3d Cir. 2008) (*quoting* section 302 and discussing *Scarpitti*, 609 A.2d at 149).  Nothing in the SPA, the Complaint, or Plaintiffs' briefing indicates that section 302 applies.

happenings.'" *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006) (*quoting*

*Third Nat'l & Trust Co. of Scranton v. Lehigh Valley Coal Co.*, 44 A.2d 571, 574 (Pa. 1945));

*see also Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 448 (Pa. 1969); *Hershey Foods*

*Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987).  In this case, the relationship

between Plaintiffs Leder and Boyle and Defendant DeAngelis is clearly predicated on the SPA.

Therefore, Plaintiffs Leder and Boyle cannot state a claim for quantum meruit and Count Eleven

must be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss will be granted as to Counts

Two, Three, Four, Six, Seven, Eight, Ten as to Plaintiff Boyleder, and Eleven.  Defendants'

motions to dismiss will be denied as to Counts Five, Nine, and Ten as to Plaintiffs Leder and

Boyle.

An appropriate Order will follow.

BY THE COURT:

_____

R. Barclay Surrick, Judge